## UNITED STATES *v.* TRENTON POTTERIES COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 27. Argued November 30, December 1, 1926.—Decided February 21, 1927.

1. A charge to a jury which was correctly given and adequately covered the case is not made erroneous by a refusal to charge in another correct form or to quote from opinions of this Court, or by the fact that it was inspired by a mistaken view of the law disclosed in a ruling previous to the trial. P. 396.

2. An agreement of those controlling over 80% of the business of manufacturing and distributing sanitary pottery in the United States, to fix and maintain uniform prices, violates the Sherman Act, whether the prices in themselves were reasonable or unreasonable. *Chicago Bd. of Trade* v. *United States,* 246 U. S. 231, distinguished. P. 396.

3. In a case of conviction and sentences upon two counts, where the sentences are in part concurrent, but do not, combined, exceed that which could have been imposed on either count alone; where the first count is sufficient and the case under it was properly submitted to the jury, and the record does not suggest that the verdict on that count was induced by evidence introduced upon the other,—objections relating to the second count may be disregarded. P. 401.

4. Under the Sherman Act, the offensive agreement or conspiracy is criminal whether or not followed by efforts to carry it into effect; but where the indictment does not charge its formation in the district, the District Court is without jurisdiction unless some act in pursuance of it took place there. P. 402.

5. Failure of the court to instruct that overt acts in the district were necessary to the jurisdiction or venue, though charging that they were not necessary to constitute the offence, was not a ground for reversal, where the defendants made no request to charge and where the jurisdictional facts were not in dispute but were clearly established by the evidence. P. 402.

6. Where much evidence was taken and a wide range of inquiry covered, a new trial is not lightly to be ordered on technical errors in the admission of evidence which do not affect matters of substance. P. 404.

7. In a prosecution of corporations and individuals under the Sherman Act, where the manager of a corporation in the same line of business but which was not one of the defendants, testified on their behalf, and on cross examination, being asked whether his company had not pleaded guilty to a violation of that Act, replied, " I don't know anything about that at all," the answer did not so prejudice the defendants as to justify a reversal, even if the question was improper. P. 404.

8. Upon redirect examination, an inquiry, relevant and otherwise competent may not be excluded merely because of its tendency to discredit the witness by showing his relations with unreliable persons. P. 405.

9. In a prosecution under the Sherman Act, refusal to admit conclusions of defendants' witnesses as to the existence of competition was not erroneous, when full opportunity was given to prove by details and records of actual transactions the conditions of the · industry within the period in question. P. 406.

300 Fed. 550, reversed.

CERTIORARI (266 U. S. 597) to a judgment of the Circuit Court of Appeals which reversed a conviction under the Sherman Act. The defendants were twenty individuals and twenty-three corporations engaged in the manufacturing of vitreous pottery fixtures used in bathrooms and lavatories.

*Assistant to the Attorney General Donovan,* with whom *Solicitor General Mitchell* and *Messrs. Rush H. Williamson,* and *William D. Whitney,* Special Assistants to the Attorney General, were on the briefs, for the United States.

*Mr. Charles E. Hughes,* with whom *Messrs. George Wharton Pepper, Edward L. Katzenbach, George H. Calvert, John W. Bishop, Jr.,* and *H. Snowden Marshall* were on the brief, for respondents.

MR. JUSTICE STONE delivered the opinion of the Court.

Respondents, twenty individuals and twenty-three corporations, were convicted in the district court for south-

ern New York of violating the Sherman Anti-Trust Law, Act of July 2, 1890, c. 647, 26 Stat. 209. The indictment was in two counts. The first charged a combination to fix and maintain uniform prices for the sale of sanitary pottery, in restraint of interstate commerce; the second, a combination to restrain interstate commerce by limiting sales of pottery to a special group known to respondents as "legitimate jobbers." On appeal, the court of appeals for the second circuit reversed the judgment of conviction on both counts on the ground that there were errors in the conduct of the trial. 300 Fed. 550. This Court granted certiorari. 266 U. S. 597. Jud. Code, § 240.

Respondents, engaged in the manufacture or distribution of 82 per cent. of the vitreous pottery fixtures produced in the United States for use in bathrooms and lavatories, were members of a trade organization known as the Sanitary Potters' Association. Twelve of the corporate respondents had their factories and chief places of business in New Jersey; one was located in California and the others were situated in Illinois, Michigan, West Virginia, Indiana, Ohio and Pennsylvania. Many of them sold and delivered their product within the southern district of New York and some maintained sales offices and agents there.

There is no contention here that the verdict was not supported by sufficient evidence that respondents, controlling some 82 per cent. of the business of manufacturing and distributing in the United States vitreous pottery of the type described, combined to fix prices and to limit sales in interstate commerce to jobbers.

The issues raised here by the government's specification of errors relate only to the decision of the court of appeals upon its review of certain rulings of the district court made in the course of the trial. It is urged that the court below erred in holding in effect (1) that the trial

court should have submitted to the jury the question whether the price agreement complained of constituted an unreasonable restraint of trade; (2) that the trial court erred in failing to charge the jury correctly on the question of venue; and (3) that it erred also in the admission and exclusion of certain evidence.

### REASONABLENESS OF RESTRAINT.

The trial court charged, in submitting the case to the jury, that if it found the agreements or combination complained of, it might return a verdict of guilty without regard to the reasonableness of the prices fixed, or the good intentions of the combining units, whether prices were actually lowered or raised or whether sales were restricted to the special jobbers, since both agreements of themselves were unreasonable restraints. These instructions repeated in various forms applied to both counts of the indictment. The trial court refused various requests to charge that both the agreement to fix prices and the agreement to limit sales to a particular group, if found, did not in themselves constitute violations of law unless it was also found that they unreasonably restrained interstate commerce. In particular the court refused the request to charge the following:

" The essence of the law is injury to the public. It is not every restraint of competition and not every restraint of trade that works an injury to the public; it is only an undue and unreasonable restraint of trade that has such an effect and is deemed to be unlawful."

Other requests of similar purport were refused including a quotation from the opinion of this Court in *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238.

The court below held specifically that the trial court erred in refusing to charge as requested and held in effect that the charge as given on this branch of the case was

erroneous. This determination was based upon the assumption that the charge and refusals could be attributed only to a mistaken view of the trial judge, expressed in denying a motion at the close of the case to quash and dismiss the indictment, that the "rule of reason" announced in *Standard Oil Co.* v. *United States,* 221 U. S. 1, and in *American Tobacco Co.* v. *United States,* 221 U. S. 106, which were suits for injunctions, had no application in a criminal prosecution. Compare *Nash* v. *United States,* 229 U. S. 373.

This disposition of the matter ignored the fact that the trial judge plainly and variously charged the jury that the combinations alleged in the indictment, if found, were violations of the statute as a matter of law, saying:

". . . the law is clear that an agreement on the part of the members of a combination controlling a substantial part of an industry, upon the prices which the members are to charge for their commodity, is in itself an undue and unreasonable restraint of trade and commerce; . . ."

If the charge itself was correctly given and adequately covered the various aspects of the case, the refusal to charge in another correct form or to quote to the jury extracts from opinions of this Court was not error, nor should the court below have been concerned with the wrong reasons that may have inspired the charge, if correctly given. The question therefore to be considered here is whether the trial judge correctly withdrew from the jury the consideration of the reasonableness of the particular restraints charged.

That only those restraints upon interstate commerce which are unreasonable are prohibited by the Sherman Law was the rule laid down by the opinions of this Court in the *Standard Oil* and *Tobacco* cases. But it does not follow that agreements to fix or maintain prices are reasonable restraints and therefore permitted by the statute, merely because the prices themselves are reasonable.

Reasonableness. is not a concept of definite and unchanging content. Its meaning necessarily varies in the different fields of the law, because it is used as a convenient summary of the dominant considerations which control in the application of legal doctrines. Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least in the light of its effect on competition, for whatever difference of. opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition. See *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290; *Standard Oil Co.* v. *United States, supra; American Column Co.* v. *United States*, 257 U. S. 377, 400; *United States* v. *Linseed Oil Co.*, 262 U. S. 371, 388; *Eastern States Lumber Association* v. *United States*, 234 U. S. 600, 614.

The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints. without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government

in enforcing the Sherman Law the burden of ascertaining from ·day to day whether it has become unreasonable through the mere variation of economic conditions. Moreover, in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of · business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies.   Compare *United States* v. *Cohen Grocery Co.,* 255 U. S. 81; *International Harvester Co.* v. *Kentucky,* 234 U. S. 216; *Nash* v. *United States, supra.*   Thus viewed, the Sherman law is not only a. prohibition against the infliction of a particular type of public injury.   It " is a limitation of rights, . . . which may be pushed to evil consequences and therefore restrained." *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 49.

That such was the view of this Court in deciding the *Standard Oil* and *Tobacco* cases, and that such is the effect of its decisions both before and after those cases, does not seem fairly open to question.   Beginning with *United States* v. *Trans-Missouri Freight Association, supra; United States* v. *Joint Traffic Association,* 171 U. S. 505, where agreements for establishing reasonable and uniform freight rates by competing lines of railroad were held unlawful, it has since often been decided and always assumed that uniform price-fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law, despite the reasonableness of the particular prices agreed upon.   In *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 237, a case involving a scheme for fixing prices, this Court quoted with approval the following passage from the lower court's opinion, (85 Fed. 271, 293):

". . . the affiants say that, in their opinion, the prices at which pipe has been sold by defendants have been reasonable. We do not think the issue an important one, because, as already stated, we do not think that at common law there is any question of reasonableness open to the courts with reference to such a contract." See also, p. 291.

In *Swift & Co.* v. *United States,* 196 U. S. 375, this Court approved and affirmed a decree which restrained the defendants "by combination, conspiracy or contract [from] raising or lowering prices or fixing uniform prices at which the said meats will be sold, either directly or through their respective agents." In *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373, 408, decided at the same term of court as the *Standard Oil* and *Tobacco* cases, contracts fixing reasonable resale prices were declared unenforcible upon the authority of cases involving price-fixing arrangements between competitors.

That the opinions in the *Standard Oil* and *Tobacco* cases were not intended to affect this view of the illegality of price-fixing agreements affirmatively appears from the opinion in the *Standard Oil* case where, in considering the *Freight Association* case, the court said (p. 65):

" That as considering the contracts or agreements, their necessary effect and the character of the parties by whom they were made, they were clearly restraints of trade within the purview of the statute, they could not be taken out of that category by indulging in general reasoning as to the expediency or non-expediency of having made the contracts or the wisdom or want of wisdom of the statute which prohibited their being made. That is to say, the cases but decided that the nature and character of the contracts, creating as they did a conclusive presumption which brought them within the statute, such result was

not to be disregarded by the substitution of a judicial appreciation of what the law ought to be for the plain judicial duty of enforcing the law as it was made."

And in *Thompson* v. *Cayser,* 243 U. S. 66, 84, it was specifically pointed out that the *Standard Oil* and *Tobacco* cases did not overrule the earlier cases. The decisions in *Maple Flooring Association* v. *United States,* 268 U. S. 563, and in *Cement Manufacturers' Protective Association* v. *United States,* 268 U. S. 588, were made on the assumption that any agreement for price-fixing, if found, would have been illegal as a matter of law. In *Federal Trade Commission* v. *Pacific States Paper Trade Association, ante,* p. 52, we upheld orders of the Commission forbidding price-fixing and prohibiting the use of agreed price lists by wholesale dealers in interstate commerce, without regard to the reasonableness of the prices.

Cases in both the federal and state courts [1] have generally proceeded on a like assumption, and in the second circuit the view maintained below that the reasonableness or unreasonableness of the prices fixed must be submitted

---

[1] The illegality of such agreements has commonly been assumed without consideration of the reasonableness of the price levels established. *Loder* v. *Jayne,* 142 Fed. 1010; *Craft* v. *McConoughy,* 79 Ill. 346; *Vulcan Power Co.* v. *Hercules Powder Co.,* 96 Cal. 510; *Johnson* v. *People,* 72 Colo. 218; *People* v. *Amanna,* 203 App. Div. 548; see *Trenton Potteries Co.* v. *Oliphant,* 58 N. J. Eq. 507, 521; *Beechley* v. *Mulville,* 102 Iowa 602, 608; *People* v. *Milk Exchange,* 145 N. Y. 267 (purchase prices). In many of these cases price-fixing was accompanied by other factors contributing to the illegality.

Upon the precise question, there has been diversity of view. *People* v. *Sheldon,* 139 N. Y. 251; *State* v. *Eastern Coal Co.,* 29 R. I. 254, 256, 265; Pope, *Legal Aspect of Monopoly,* 20 Harvard Law Rev. 167, 178; Watkins, *Change in Trust Policy,* 35 Harvard Law Rev. 815, 821–3; (reasonableness of prices immaterial) *contra: Cade & Sons* v. *Daly,* [1910] 1 Ir. Ch. 306; *Central Shade Roller Co.* v. *Cushman,* 143 Mass. 353; *Skrainka* v. *Scharringhausen,* 8 Mo. App. 522; *Dueber Watch Case Mfg. Co.* v. *Howard Watch Co.,* 55 Fed. 851.

to the jury has apparently been abandoned. See *Poultry Dealers' Association* v. *United States,* 4 Fed. (2d) 840. While not necessarily controlling, the decisions of this Court denying the validity of resale price agreements, regardless of the reasonableness of the price, are persuasive. See *Dr. Miles Medical Co.* v. *Park & Sons Co., supra; Boston Store of Chicago* v. *American Graphophone Co.,* 246 U. S. 8; *United States* v. *Schrader's Sons,* 252 U. S. 85; *Federal Trade Commission* v. *Beechnut Packing Co.,* 257 U. S. 441.

Respondents rely upon *Chicago Board of Trade* v. *United States, supra,* in which an agreement by members of the Chicago Board of Trade controlling prices during certain hours of the day in a special class of grain contracts and affecting only a small proportion of the commerce in question was upheld. The purpose and effect of the agreement there was to maintain for a part of each business day the price which had been that day determined by open competition on the floor of the Exchange. That decision, dealing as it did with a regulation of a board of trade, does not sanction a price agreement among competitors in an open market such as is presented here.

The charge of the trial court, viewed as a whole, fairly submitted to the jury the question whether a price-fixing agreement as described in the first count was entered into by the respondents. Whether the prices actually agreed upon were reasonable or unreasonable was immaterial in the circumstances charged in the indictment and necessarily found by the verdict. The requested charge which we have quoted, and others of similar tenor, while true as abstract propositions, were inapplicable to the case in hand and rightly refused.

The first count being sufficient and the case having been properly submitted to the jury, we may disregard certain

42847°—27——26

like objections relating to the second count. The jury returned a verdict of guilty generally on both counts. Sentence was imposed in part on the first count and in part on both counts, to run concurrently. The combined sentence on both counts does not exceed that which could have been imposed on one alone. There is nothing in the record to suggest that the verdict of guilty on the first count was in any way induced by the introduction of evidence upon the second. In these circumstances the judgment must be sustained if either one of the two counts is sufficient to support it. *Claassen* v. *United States,* 142 U. S. 140; *Locke* v. *United States,* 7 Cranch 339, 344; *Clifton* v. *United States,* 4 How. 242, 250.

### QUESTION OF VENUE.

The trial court instructed the jury in substance that if it found that the respondents did conspire to restrain trade as charged in the indictment, then it was immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry the object of the conspiracy into effect. The court below recognized that this charge was a correct statement of the general proposition of law that the offensive agreement or conspiracy alone, whether or not followed by efforts to carry it into effect, is a violation of the Sherman Law. *Nash* v. *United States, supra.* And it was clearly the intent and purpose of the trial judge to deal with that aspect of the case in giving it. But the appellate court held the charge erroneous and ground for reversal because the trial judge did not go further and charge the necessity of finding overt acts within the southern district of New York to satisfy jurisdictional requirements. Since the indictment did not charge the formation of the conspiracy or agreement within that district, the court was without jurisdiction unless some act pursuant to the agree-

ment or conspiracy took place there.   *Hyde* v. *United States,* 225 U. S. 347; *Easterday* v. *McCarthy,* 256 Fed. 651.

This part of the charge, so far as respondents deemed it objectionable in that the absence of efforts to carry out the agreement might be taken into account in determining whether it was in fact made, was promptly remedied by an instruction, that the jury might consider all the facts in determining whether a combination or conspiracy had been entered into.   But respondents made no request to charge with respect to venue or the jurisdictional necessity of overt acts within the district.   Neither did they except to the charge as given nor move to dismiss the indictment on that ground.   A motion in arrest of judgment was directed to the jurisdictional sufficiency of the indictment but the adequacy of the evidence establishing jurisdiction was not questioned.

The reason for this complete failure of respondents to point out the objection to the charge now urged, or otherwise to suggest to the trial court the desirability of a charge upon the facts necessary to satisfy jurisdictional requirements is made plain by an inspection of the record.

In point of substance, the jurisdictional facts were not in issue.   Although the respondents were widely scattered, an important market for their manufactured product was within the southern district of New York, which was therefore a theatre for the operation of their conspiracy, adjacent to the home of the largest group of the respondents located in a single state.   The indictment sufficiently alleged that the conspiracy was carried on in the southern district of New York by combined action under it.   The record is replete with the evidence of witnesses for both prosecution and defense, including some of the accused, who testified without contradiction to the course of business within the district, the circulation of price bulletins, and the making of sales there by some of the members of :

the association organized by respondents. The secretary testified that, acting for the association, he effected sales within the district. All of these were overt acts sufficient for jurisdictional requirements. In such a state of the record, the appellate court might well have refused to exercise its discretionary power to disturb the conviction because of the trial court's failure to give a charge not requested. If this failure to guard against the misinterpretation of a correct charge is to be deemed error it was of such slight consequence in the actual circumstances of the case and could have been so easily corrected by the trial judge had his attention been directed to it, that the respondents should not have been permitted to reap the benefit of their own omission.

### QUESTIONS OF EVIDENCE.

The alleged errors in receiving and excluding evidence were rightly described by the court below as minor points. The trial lasted four and one-half weeks. A great mass of evidence was taken and a wide range of inquiry covered. In such a case a new trial is not lightly to be ordered on grounds of technical errors in ruling on the admissibility of evidence which do not affect matters of substance. We take note only of some of the objections raised which sufficiently indicate the character of others, all of which we have considered.

Respondents called as a witness the manager of a potteries corporation which was not a defendant. On cross-examination, he was asked whether he knew that his concern had pleaded guilty to a violation of the Sherman Act, to which he answered, " I don't know anything about that at all." While it may be within the discretion of the trial judge to limit cross-examination of this type, we would not be prepared to say that such a question, when allowed, would be improper, if its admissibility were urged on the

ground that it was directed to the bias of the witness, *Wabash Screen Door Co.* v. *Black,* 126 Fed. 721, 726; 2 Wigmore, Evidence (2d ed.) § 949, or that it was preliminary to showing his implication in the supposed offense, and thus affecting his credibility. But in any case, we do not think the answer given prejudiced the respondents in any such substantial way as to justify a reversal. *Davis* v. *Coblens,* 174 U. S. 719, 727; *Blitz* v. *United States,* 153 U. S. 308, 312.

It was a part of the government's case to show that it was the purpose of respondents, in aid of their price-fixing agreement, not to sell second grade or Class "B" pottery in the domestic market. The government offered evidence, including the testimony of the secretary of the respondents' association, to show that a distinct association of jobbers of pottery was coöperating in this effort and that its secretary had tendered his active assistance to confine the sale of this class of pottery to the export trade. On cross-examination of the secretary of the respondents' association, the fact was brought out that at one time twenty out of twenty-four members were selling Class "B" pottery in the domestic market. On re-direct examination, the government asked questions of the witness tending to show that at about that time the secretary of the Jobbers' Association had been called for examination before a committee of the New York Legislature, conducting a general investigation into restraints of trade and extortions in connection with the building industry in New York City and vicinity, an investigation of which the lower court took judicial notice. It was held below and it is urged here that because of the known character of the investigation, the evidence should have been excluded because it improperly "smirched" the witness by showing that he had relations with an "unreliable" person. But the brief statement which we have given of

the record makes it plain that the testimony sought was material in explaining the failure of the members of the respondents' association at that time to confine their sales of Class " B " pottery to the export market as promised. The inquiry was not directed to the impeachment of the government's own witness. Its purpose was to dispel the adverse impression possibly created by the cross-examination. An inquiry otherwise relevant and competent may not be excluded merely because it tends to discredit the witness by showing his relations with unreliable persons.

Respondents called numerous witnesses who were either manufacturers or wholesale dealers in sanitary pottery, to show that competition existed among manufacturers, particularly the respondents, in the sale of such pottery. On direct examination these witnesses were asked in varying form, whether they had observed or noted competition among the members of the association. The questions were objected to and excluded on the ground that they were too general and vague in character and called for the opinion or conclusion of the witness.

Whenever the witness was asked as to the details of transactions showing competition in sales, his testimony was admitted and the introduction of records of prices in actual transactions was facilitated by stipulation. Whether or not such competition existed at any given time is a conclusion which could be reached only after the consideration of relevant data known to the witness. Here the effort was made to show the personal conclusion of the witness without the data and without, indeed, showing that the conclusion was based upon knowledge of relevant facts. Hence, the offered evidence, in some instances, took the form of vague impressions, or recollections of the witness as to competition, without specifying the kind or extent of competition.

A certain latitude may rightly be given the court in permitting a witness on direct examination to testify as to his conclusions, based on common knowledge or experience. Compare *Erie R. R.* v. *Linnekogel,* 248 Fed. 389; 2 Wigmore, § 1929. Even if these questions could properly have been allowed here, we cannot say that the discretion of the court was improperly exercised in excluding the conclusions of the witnesses as to competitive conditions when full opportunity was given to prove by relevant data the conditions of the industry within the period in question.

Other objections urged by respondents to the sufficiency of the indictment and charge have received our consideration but do not require comment.

It follows that the judgment of the circuit court of appeals must be reversed and the judgment of the district court reinstated.

*Reversed.*

Mr. Justice Van Devanter, Mr. Justice Sutherland and Mr. Justice Butler dissent.

Mr. Justice Brandeis took no part in the consideration or decision of this case.