COMPANIA de SALVADORENA de CAFE, S. A., a corporation, and Exportadora de Cafe Honduras, S. A., a corporation, Plaintiffs,

v.

COMMODITIES FUTURES TRADING COMMISSION and New York Coffee and Sugar Exchange, Inc., Defendants.

No. 77 Civ. 5820.

United States District Court, S. D. New York.

March 13, 1978.

---

Skadden, Arps, Slate, Meagher & Flom, New York City (Michael H. Diamond, New York City, Allen Weed, Dallas, Tex., of counsel), Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., for plaintiffs.

Barrett, Smith, Schapiro, Simon & Armstrong, New York City, for defendants (Edmund R. Schroeder, Warren H. Colodner, Dwight E. Timbers, New York City, of counsel).

LASKER, District Judge.

On November 23, 1977, the New York Coffee and Sugar Exchange, Inc. ("Exchange"), a commodities futures trading market, exercised its emergency powers by ordering the reduction of all holdings in coffee futures contracts.[1] This action was taken amid reports that some coffee producing nations were attempting to drive coffee prices up. The Commodities Futures Trading Commission ("Commission") and the Exchange both believed that a small group of coffee traders held an unusually large number of contracts for the future delivery (to them) of coffee (Affidavit of John M. Schobel, Jr., Vice-President of the Exchange, at ¶¶ 7–9). The Exchange resolution, issued by the Board of Managers pursuant to its emergency powers (see Exchange By-Law 132), announced that all those who, like plaintiffs,[2] directly or indirectly owned or controlled coffee futures contracts would have to liquidate their positions on a phased schedule (see ¶ (2)(a)(i), Exchange resolution).

On the same day, the Commission invoked its emergency powers, 7 U.S.C. § 12a(9) (Supp. IV 1974), and issued an order substantively identical to the Exchange's. That is, the Commission's order, though addressed to the Exchange, rather than to members and traders, commanded the Exchange to "direct and enforce" a reduction program identical to the one contained in the Exchange's resolution. In fact, the Commission's order provided that the Exchange would be in compliance if it proceeded in accordance with its own, November 23rd resolution.

On December 1, 1977, the day before the first of the three scheduled liquidations was to have been completed, Compania and Excaho filed a complaint seeking declaratory and injunctive relief against both defendants on the grounds that they had violated the Fifth Amendment to the United States Constitution, as well as the Administrative Procedure Act, 5 U.S.C. §§ 551–59 and the Commodity Exchange Act, 7 U.S.C. §§ 1–22 (Supp. IV 1974). Against the Exchange, it was further alleged that it had violated its own By-Law 132. Upon the filing of the complaint, plaintiffs moved for a temporary restraining order, preventing the defendants from enforcing the December 2nd liquidation phase. The motion was denied (see Transcript, December 2, 1977). Subsequently, both defendants moved to dismiss the complaint. The Commission took the position that the court lacked jurisdiction to consider the Commission's order, issuance of which was contended to have been an act of unreviewable discretion. The Exchange argued that, as to it, the complaint failed to state a claim for relief because, absent allegations of bad faith (no such allegations were made here) the emergency action taken by the Board of Managers was fully countenanced by By-Law 132. The Exchange also asserted that since the Board's action was, absent the bad faith claims, unassailable and, independently of the Commission's order, sufficient to accomplish the contested liquidation, it was unnecessary to pass on the question of Commission review. That is, the Exchange urged that a finding that it was authorized to command liquidation, that it had done so, and that it had done so according to the rules (properly) had the practical and legal effect of making the Commission's action superfluous.

\* \* \* \* \* \*

The specific allegations against the Exchange are that it declared an emergency without notice, hearing, or specific findings of fact and that the remedy it imposed was arbitrarily severe.[3] The allegations amount

---

1. The text of the Exchange's resolution is annexed as Exhibit A to Michael Diamond's Affidavit in Support of the Order to Show Cause.

2. "Compania" and "Excaho".

3. In pertinent part, the complaint alleges that:
   "27. The Exchange Resolution was issued without prior public notice, or notice to Compania and/or Exportadora or to any other person holding any interest in the December 1977 C Contracts. This Resolution was also issued without any hearing or opportunity for the submission of evidence or argument by Compania, Exportadora, or by any other person.
   "28. The Exchange's Resolution concludes that

to a claim that the Exchange violated both the due process clause of the Fifth Amendment and By-Law 132.[4]

Of course, the Exchange cannot be charged with deprivation of due process unless its announcement of and remedial prescription for an emergency amounted to governmental action. In their legal memoranda in opposition to the motions to dismiss, plaintiffs contend that such a finding is indicated by (1) the pervasive regulation of the Exchange by the Commission[5] and (2) the alleged fact that the Commission participated in, perhaps instigated or coerced, the promulgation of the Exchange order.[6]

■ It should be noted that the plaintiffs have submitted no evidence of coercion. On the other hand, both the Schobel affidavit and representations made at oral argument specify that the Exchange issued its

order voluntarily, if not independently. Except to contradict the charge of coercion, there is no need to decide whether the Exchange's emergency actions were governmental action, for we find that the plaintiffs consented to the emergency procedures that were used in this case and have accordingly waived whatever due process rights they may have as against the Exchange.

■ Exchange By-Law 132 specifically empowers the Board to take emergency action in the face of

"[a]ny occurrence or circumstance which, in the opinion of the Board of Managers, requires immediate action and threatens or may threaten such things as the fair and orderly trading in, or the liquidation of or delivery pursuant to, any contract for the future delivery of a commodity on this Exchange."

the situation which exists with respect to the December 1977 Coffee 'C' Contract may be conducive to an attempt to manipulate prices and may constitute an actual, attempted, or threatened corner, squeeze, congestion or undue concentration of position and that such circumstances may exist as to unduly affect the performance of the December 1977 Coffee 'C' Contract.
That conclusion is not based upon or supported by any specific fact findings or evidentiary record.
"29. In enacting the Resolution, the Exchange did not make the finding required by Section 132 of its By-Laws that
'a situation of such extreme urgency arises that a rigid enforcement of contracts generally would be grossly at variance with just and equitable principles of trade. . . .'
Indeed, the Exchange did not have before it an evidentiary record that would have supported such a finding.
"30. The Exchange's Resolution is arbitrarily and substantially more severe than previous actions by the Exchange, under similar circumstances, to regulate trading in coffee 'C' futures. In September 1976 and in July and September 1977 the Exchange informally requested holders of positions to liquidate those positions."

4. Although the complaint characterizes the allegations as violations of (in addition to the Fifth Amendment and By-Law 132) the Commodity Exchange Act and the Administrative Procedure Act, the specific claims against the Exchange are unrelated to either of those federal statutes, neither of which has any apparent applicability to the Exchange in this case. In

any event, however the allegations are characterized, they fail to state a claim against the Exchange.

5. In making the "extensive regulation" argument, plaintiffs rely on a series of lower court cases that were decided before *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The Court in *Jackson* explicitly rejected the contention, which had been accepted in the pre-*Jackson,* lower court decisions, that "extensive and detailed" regulation might provide the element necessary for a finding of government action. Instead, the *Jackson* Court ruled that such a finding depends on a close link between the government and the specific challenged action of the private entity. *Id.,* 419 U.S. at 350–51, 95 S.Ct. 449. In particular, it was found that because the government had not *ordered* the private entity to engage in the contested practice, the act of the latter retained its private quality.

There is a suggestion in *Jackson* that short of commanding, the government may be held to have acted through a private agency where it specifically authorizes and approves a challenged procedure that is initiated by the private entity. *Id.,* 419 U.S. at 354, 95 S.Ct. 449. Because our disposition of the motion does not depend on a finding of governmental action, it is unnecessary to decide which of the two *Jackson* standards ought to be applied in this case.

6. The coercion argument is made in the plaintiffs' Memorandum in Opposition at 17–19 and in their Supplemental Memorandum at 3–6.

The Exchange contends, plaintiffs concede, and we find that trading on the Exchange, by members and non-members alike, is explicitly subject to the By-Laws and Rules of the Exchange (see Exchange Coffee Contract 'C' Trade Rule 25; and see Exchange By-Law 51(3) together with By-Law 104). Plaintiffs do not contend that they were unaware of By-Law 132 or their agreement to abide by it. Neither do they contend that they misunderstood the By-Law's terms, or its effect. See D. H. Overmyer Co., Inc. v. Frick Co., 405 U.S. 174, 186, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). Both Compania and Excaho are sophisticated corporations which trade coffee contracts on a "worldwide basis" (¶¶ 3, 4, 9, Complaint; ¶¶ 2, 3, Diamond Affidavit). Compare Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Both corporations have traded on the Exchange for years (¶ 11, Diamond Affidavit).

Rather than challenge the intelligence or voluntariness of their waiver, plaintiffs argue that agreement to be bound by By-Law 132 is not an agreement to waive "their due process rights to have the Exchange *establish by an appropriate factual record that an emergency in fact exists.*" (Plaintiffs' Supplementary Memorandum at 12) (emphasis added). These rights are, however, precisely what is waived by subscription to By-Law 132. The power to declare an emergency is vested in the discretion of the Board. The Board is authorized by a subscribing member to act on the basis of *opinion,* without formal findings of fact or the compilation of a factual record.[7] Furthermore, an obligation of the Board to hold pre-declaration hearings upon notice would be incompatible with the authorization of the By-Law, which conceives the declaration of emergency as a response to a situation which is believed to require *immediate* action. Once an emergency is declared the Board may respond in any way it thinks (in good faith) "necessary and appropriate" to the situation; its responses are subject only to the restriction that they be approved by a two thirds vote of the Board. In light of the Board's discretionary power to fashion remedies, the charge that the liquidation order was "arbitrary" or too "severe" (see ¶ 30, Complaint) fails to state a claim.[8]

The discretion of the Board to declare and meet an emergency is, as is apparent from the above discussion, not subject to due process limitations: the power is without limit except that the Board must act in good faith. *Daniel v. Board of Trade,* 164 F.2d 815, 818–19 (7th Cir. 1947), cited with approval in *Lagorio v. Board of Trade,* 529 F.2d 1290, 1291 (7th Cir.), cert. denied, 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976); *Crowley v. Commodity Exchange,* 141 F.2d 182, 184 (2d Cir. 1944); and see, *Cargill, Inc. v. Board of Trade,* 164 F.2d 820, 823 (7th Cir. 1947). There is here no allegation that the Board acted in bad faith tantamount to fraud.[9] Absent such an allegation, the authorization contained in By-Law 132 is fully effective and it supports the actions that were taken in this case.

For the reasons stated, the Exchange's motion to dismiss is granted. This disposition makes it unnecessary to determine whether, as the Commission alleges, the court lacks jurisdiction over it because its actions are not reviewable as a matter of law. We recognize that at argument on the motions counsel for the Commission and for the plaintiffs requested that we determine

---

7. Of course, By-Law 132 does not prevent compilation of a factual record.

8. Moreover, one of the remedies contained in the By-Law's list of available curative responses—the list is explicitly exemplary, not exhaustive, of the Board's remedial powers—is "ordering the liquidation of contracts, the fixing of a settlement price or the reduction in positions . . . ."

9. It is unnecessary to decide whether an allegation that the board acted when there was *no* reason to believe an emergency (as that term is defined in the By-Law) existed would constitute an allegation of bad faith amounting to fraud. The complaint levels no such charge against the Exchange, and the uncontested affidavit of Schobel (¶¶ 7–9 and Exhibit A) contains evidence supporting the Board's conclusion that an emergency existed.

the issue of reviewability even though the matter might not be necessary for disposition of the case at hand. However, on reflection and further review of the file we are persuaded that this case is not a vehicle for what appears to be a question of first impression: whether the CFTC's actions in declaring an emergency under the statute are judicially reviewable.

The Exchange's motion is granted and the complaint is dismissed.

It is so ordered.